Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 10, 2003         Decided July 1, 2003

No. 02-1308

DOMESTIC SECURITIES, INC.,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

NASDAQ STOCK MARKET, INC.,
INTERVENOR

On Petition for Review of an Order of the
Securities and Exchange Commission

*Warren L. Dennis* argued the cause for petitioner. With him on the briefs was *Linda Lerner*.

*Susan S. McDonald*, Senior Litigation Counsel, Securities & Exchange Commission, argued the cause for respondent. With her on the brief were *Meyer Eisenberg*, Deputy General

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Counsel, *Jacob H. Stillman*, Solicitor, and *John W. Avery*, Special Counsel.

*Peter E. Greene* argued the cause and filed the brief for intervenor.

Before: SENTELLE, ROGERS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Under the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (2000), the Securities and Exchange Commission (SEC or Commission) must approve any changes to the rules of the National Association of Securities Dealers, Inc. (NASD), the private organization responsible for self-regulation of the over-the-counter (OTC) securities market. In 2002, the SEC issued an order approving a NASD proposal to implement a new computerized quotation and trade execution system, known as SuperMontage, for the Nasdaq Stock Market, Inc. (Nasdaq). In its petition for review, Domestic Securities, Inc. (Domestic), an Electronic Communications Network, challenges a feature of the trade execution rules governing SuperMontage, arguing that it discriminates against ECNs and harms competition. Domestic also challenges the SEC's approval of an Alternative Display Facility, which was designed to provide a quotation display mechanism for traders who do not wish to use SuperMontage. We hold that we lack jurisdiction over Domestic's challenge to SuperMontage's trade execution rules because the rules were approved in an earlier SEC order, and Domestic failed to seek timely review of that order. We deny Domestic's petition for review of the ADF approval order because the SEC's order was supported by substantial evidence and was not arbitrary or capricious.

## I. Background

A. Statutory and Factual Background

In 1975, Congress enacted amendments to the Securities Exchange Act of 1934, directing the SEC to "facilitate the establishment of a national market system." 15 U.S.C. § 78k–1(a)(2). Specifically, Congress charged the SEC "to use

modern communication and data processing equipment to link all securities markets nationwide." *Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1094 (D.C. Cir. 1978); *see also* 15 U.S.C. § 78k–1(a)(1)(D). In centralizing the market for securities, Congress sought, *inter alia*, to promote "economically efficient execution of securities transactions" while maintaining "fair competition" between securities brokers and dealers. *Id.* § 78k–1(a)(1)(C)(i)-(ii).

NASD has played an important role in the establishment of the national securities market. NASD is the only "national securities association" registered with the SEC pursuant to 15 U.S.C. § 78o–3. As a registered national securities association, NASD must maintain rules that, *inter alia*, "remove impediments to . . . a free and open market and a national market system, and . . . protect investors and the public interest," while permitting neither "unfair discrimination between customers, issuers, brokers, or dealers," *id.* § 78o–3(b)(6), nor the imposition of "any burden upon competition not necessary or appropriate in furtherance of the purposes" of the Act, *id.* § 78o–3(b)(9). *See Timpinaro v. SEC*, 2 F.3d 453, 456 (D.C. Cir. 1993). In addition, NASD is a self-regulatory organization (SRO) responsible for regulation of the OTC securities market, 15 U.S.C. § 78s. As an SRO, NASD must file with the Commission any proposed change to its rules. *Id.* § 78s(b)(1); *NASD, Inc. v. SEC*, 801 F.2d 1415, 1416 (D.C. Cir. 1986). After notice and comment, the Commission may approve the rule change if it finds that the change is consistent with the Act and regulations governing the SRO. 15 U.S.C. § 78s(b)(2)(B).

Since 1971, NASD has operated an electronic automated quotation system–the NASD Automated Quotation system, or "Nasdaq," which affords dealers the means to display and instantaneously update their "bid" and "ask" quotations for securities, for which they are registered with NASD as market makers. By 1984, the Nasdaq system had evolved from providing only price quotations to providing automatic execution of some trades.

Also in the mid–1980s, Instinet developed the first Electronic Communications Network (ECN or Network), which provided a private trade execution network for its subscribers. Subscribers, usually dealers or institutional investors, could post "limit orders"–orders to buy or sell a specific number of shares of a security at a specific price; the Instinet computer system matched those orders with the orders of other subscribers and automatically executed the trades via computer. Oftentimes, Instinet could provide a better price than Nasdaq in a given security because market makers were not required to post on Nasdaq customer limit orders that were priced better than the market makers' own best bid or offer quotations for the same securities. Thus, market makers could display one set of prices for retail customers on Nasdaq while offering more favorable prices through Instinet.

To address this discrepancy, in 1996 the SEC adopted the "order handling rules" (OHR or the Rules), which require a market maker, or an ECN on its behalf, to publish in the national market the market maker's best-priced customer limit orders and to provide trading access to those orders. *See* 61 Fed. Reg. 48,290 (Sept. 12, 1996). The Rules brought market makers' best-priced limit orders into the national market system and put ECNs in direct competition with market makers for the business of customer limit orders. *Id.* at 48,307. It also gave non-ECN subscribers access to the best-priced limit orders displayed on an ECN. Previously, the ECN had charged each side of a trade executed on its system–both of whom were subscribers–an execution fee. Recognizing this, the SEC allowed the network to continue to impose charges for access to its system, so long as the fee was "not structured to discourage access by non-subscriber broker-dealers." *Id.* at 48,314 n.272.

After the adoption of the OHR, several companies began operating ECNs, including the petitioner, Domestic. In 1998, the Commission adopted Regulation ATS, which, *inter alia*, required each network to display all of its limit orders in the national market system and provide trading access to those orders. 63 Fed. Reg. 70,844, 70,865–73 (Dec. 22, 1998).

Regulation ATS also expressed the Commission's view that exchanges, such as Nasdaq, could be operated as for-profit corporations. *Id.* at 70,849, 70,882–84. Nasdaq opted to become a for-profit entity. Although NASD remains the parent corporation of Nasdaq, the SEC has promulgated regulations designed to ensure that NASD does not use its regulatory authority to promote its pecuniary interest in Nasdaq.

By the late 1990s, Nasdaq had become a virtual trading floor for the national OTC securities market, offering sophisticated computerized trade execution capabilities. ECNs' limit orders were displayed alongside the quotations and limit orders of Nasdaq market makers. Nasdaq's trade execution system permitted market participants to enter only a single quotation on each side of the market for each security into the system at any one time. The quotations were arranged as a montage according to price and time. Two types of execution were available through Nasdaq: (1) SuperSOES, which allowed participants to execute small orders automatically against the quotation of a market maker; and (2) SelectNET, which allowed participants to route orders to a particular market maker or ECN for non-automatic execution. The automatic execution feature of SuperSOES created a risk of double liability for an ECN if its displayed quotation or limit order had been executed internally–*e.g.*, on an ECN's internal network–shortly before the SuperSOES automatic execution occurred. To avoid this risk, the ECNs did not participate in SuperSOES, but participated only in SelectNet. Under SelectNet, ECNs received only order delivery, and could decline to execute the order if it had already been executed internally. Over time, some ECNs began declining to execute orders, not because of prior internal execution, but because the broker submitting the order had failed to pay the ECN's SEC-authorized access fees.

In 1999, Nasdaq proposed to implement SuperMontage, a new trade execution system, to consolidate SuperSOES and SelectNet and to completely integrate quote and limit order display with order execution. SuperMontage allows participants to enter multiple quotations and orders. Participants

may choose either to direct an order to a specified market maker or ECN or to have an order matched generally with the best price available, with price ties broken by a queue based on the time the quotation was entered. ECNs that charge access fees are placed last in the queue at each price level. Market participants are not required to use Super-Montage to execute trades, but may choose to continue to use any other method, including ECNs' private networks.

Under SuperMontage, ECNs retain their ability to take order delivery rather than automatic execution. An order delivery ECN is electronically presented with an order and is given up to thirty seconds to indicate whether or not it will accept the order. If the ECN declines the trade, the system automatically re-routes the order to the next participant in the SuperMontage queue.

The feature of SuperMontage challenged by Domestic is known as "decrementation." Under the decrementation feature, when an order delivery ECN declines a trade for any reason, the system treats the ECN's displayed limit order as no longer valid and automatically decrements it–or "zeroes it out"–removing it from the SuperMontage display. If an ECN still wishes to trade the shares over SuperMontage at the quoted price, it may immediately re-enter the limit order into the SuperMontage system. The re-entered order, however, will go to the end of the queue as the most recently entered quotation at that price.

The Commission claims that decrementation is necessary to avoid "locked" or "crossed" markets. A locked market occurs when the highest quoted bid price equals the lowest quoted ask price. A crossed market occurs when the highest bid price is greater than the lowest quoted ask price. According to the SEC, "continued locking and crossing of the market can negatively impact market quality" and requires manual, special handling of orders by all market participants until the quotations are unlocked or uncrossed. SuperMontage avoids locked and crossed markets by decrementing the limit order of an ECN that declines to execute a trade.

B.   Proceedings Before the Commission

The SEC initially published the proposed SuperMontage rules in December 1999.  *See* 64 Fed. Reg. 68,125 (Dec. 6, 1999).  The proposed rules were amended and re-published several times between December 1999 and November 2000, and with each publication the SEC solicited and received public comments.  *See* 65 Fed. Reg. 16,981 (Mar. 30, 2000); 65 Fed. Reg. 49,842 (Aug. 15, 2000); 65 Fed. Reg. 69,084 (Nov. 15, 2000).  SuperMontage's decrementation feature was described in the initial notice of the proposed rules, 64 Fed. Reg. at 68,132, and remained essentially the same throughout the proposed rules' several revisions, 65 Fed. Reg. at 16,986; 65 Fed. Reg. at 49,847; 65 Fed. Reg. at 69,090.  Nonetheless, neither Domestic nor any other ECN raised any concerns about the decrementation feature while the SuperMontage rules were under consideration.

On January 19, 2001, the SEC issued an order approving the SuperMontage rules, including the decrementation feature. 66 Fed. Reg. 8020 (Jan. 26, 2001) (SuperMontage Approval Order).  The SEC found the proposed rule to be in the public interest and in furtherance of the Exchange Act's goals of competition and efficiency.  The SEC, however, delayed the implementation of SuperMontage.  In response to several commenters' concern that SuperMontage would allow Nasdaq to dominate the OTC market and "compete unfairly for market order flow," the SEC conditioned the implementation of SuperMontage on NASD's provision of an Alternative Display Facility (ADF or Facility) that "[i]n effect, makes participation in SuperMontage voluntary" for market participants.  The SEC required that the ADF permit NASD members to satisfy their obligation to display their best-priced quotes and limit orders without participating in Super-Montage and "provide a market neutral linkage to the Nasdaq and other marketplaces, but not an execution service."

In December 2001, NASD submitted proposed rules governing the establishment and operation of an ADF.  The SEC published the proposed rules for the first time on January 3, 2002. 67 Fed. Reg. 388.  Thereafter, the proposed

rules were amended once and republished for comment. On July 24, 2002, the SEC approved the amended rules, which allowed NASD to operate the facility "on a pilot basis" for nine months, until April 24, 2003. 67 Fed. Reg. 49,822 (ADF Pilot Order). The ADF Pilot Order addressed the concerns of several commenters regarding connectivity to the ADF.

On August 29, 2002, the SEC issued an order providing for the implementation of SuperMontage (Implementation Order). 67 Fed. Reg. 56,862 (Sept. 5, 2002). The Commission determined that the ADF Pilot Program satisfied the conditions set in the January 19, 2001 SuperMontage Approval Order. Consequently, the Commission ordered that Super-Montage be implemented on October 11, 2002.

On October 7, 2002, Domestic filed this petition for review of the Implementation Order.

## II. Analysis

In its petition, Domestic raises two issues. First, Domestic challenges the decrementation feature of SuperMontage, claiming that the SEC did not provide adequate notice that decrementation would occur when an ECN declines an order because the firm entering the order has not paid the ECN's access fees. Domestic further contends that this application of decrementation discriminates against ECNs by harming ECNs' ability to compete for order flow and impairing ECNs' right to charge reasonable access fees for their services. In sum, Domestic claims that the SEC acted arbitrarily and capriciously and contrary to the Securities Exchange Act's pro-competitive mandate when it approved the decrementation aspect of the SuperMontage rules. Second, Domestic challenges as unsupported by substantial evidence the SEC's conclusion that the ADF satisfied the conditions laid out in the SuperMontage Approval order, and claims that the ADF does not provide an adequate alternative to SuperMontage. Specifically, Domestic asserts that the ADF is technologically deficient because it lacks a means by which ECNs can easily connect to it. We consider in turn Domestic's claims.

A. Decrementation

We need not examine the specifics of Domestic's challenge to SuperMontage's decrementation feature because its challenge is not timely. As explained above, the SEC approved the SuperMontage trade execution rules, including decrementation, in its January 19, 2001 SuperMontage Approval Order. Section 25(a)(1) of the Securities Exchange Act provides that a party aggrieved by a "final order" of the Commission may obtain judicial review by filing a petition for review "within sixty days after the entry of the order." 15 U.S.C. § 78y(a)(1). Failure to file a timely petition for review deprives this Court of subject matter jurisdiction. *See Jordan v. Fed. Election Comm'n*, 68 F.3d 518, 518–19 (D.C. Cir. 1995); *Newell v. SEC*, 812 F.2d 1259, 1260 (9th Cir. 1987). Domestic did not file the instant petition for review until October 7, 2002, far outside the statutory sixty-day time limit. Nonetheless, Domestic contends we have jurisdiction over its challenge to SuperMontage's decrementation feature for two reasons.

First, Domestic contends that its petition for review of the decrementation feature is timely because the SuperMontage Approval Order was not a "final order" within the meaning of 15 U.S.C. § 78y(a)(1). Because the SEC conditioned implementation of SuperMontage on the approval of an ADF, Domestic reasons that the SuperMontage Approval Order did not become final until the Implementation Order of August 29, 2002. We disagree.

The Supreme Court applies a two-part test for determining the finality of agency action. A final action: (1) "mark[s] the consummation of the agency's decisionmaking process–it must not be of a merely tentative or interlocutory nature"; and (2) the action "must be one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and quotations omitted); *see also Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1037 (D.C. Cir. 2002). The SuperMontage Approval Order meets both prongs of the *Bennett* test. The order plainly "mark[ed] the consummation of the agency's

decisionmaking process" concerning the SuperMontage rules. *Bennett*, 520 U.S. at 178. After more than one year of considering the rules and three sets of amendments and republications for comment, the SuperMontage Approval Order mandated "that the SuperMontage proposal ... be and hereby is approved." 66 Fed. Reg. at 8057. Nothing in the order suggested that the SEC's approval of the rules was "tentative or interlocutory." *Bennett*, 520 U.S. at 178. The SEC did not reconsider or revise the SuperMontage rules in its later orders concerning the ADF. Moreover, the rules finally determined the "rights and obligations" of Nasdaq and of each market participant who trades on SuperMontage. *Id.*

Domestic contends that the SuperMontage Approval Order was non-final because SuperMontage could not be implemented until the ADF was approved. Furthermore, Domestic argues that the ADF approval proceedings reopened the consideration of SuperMontage's rules. By the latter argument, Domestic seeks to invoke our "reopener doctrine," which "allows judicial review where an agency has–either explicitly or implicitly–undertaken to reexamine its former choice." *Nat'l Min. Ass'n v. United States Dep't of Interior*, 70 F.3d 1345, 1351 (D.C. Cir. 1995) (quotations omitted). To be sure, the SEC did condition the implementation of Super-Montage on the approval of an adequate ADF. The existence of this condition to SuperMontage's implementation, however, does not affect the finality of the SuperMontage Approval Order because the condition was unrelated to the substance of the SuperMontage rules. In the ADF approval proceedings, the SEC considered the adequacy of the ADF, an entity wholly distinct from SuperMontage. It did not explicitly or implicitly reconsider the substance of the SuperMontage trade execution rules, nor did the SEC's consideration of the ADF's adequacy have any bearing on the SuperMontage rules. Thus, contrary to Domestic's contention, our reopener doctrine is inapplicable here. In short, the only issue regarding the SuperMontage rules remaining after the SuperMontage Approval Order was the timing of SuperMontage's implementation. There was no question that the substance of SuperMontage's trade execution rules, including the decre-

mentation feature, would remain the same and would ultimately be implemented. Consequently, we conclude that the SuperMontage Approval Order was a final order and that Domestic's petition for review, insofar as it raises the decrementation issue, falls outside the applicable sixty-day statutory time limit.

In the alternative, Domestic points to *Raton Gas Transmission Co. v. FERC*, 852 F.2d 612 (D.C. Cir. 1988), in which we noted "exceptional situations in which an objection to an agency regulation is considered timely even after the statutory review period has ended," such as "when the agency's action did not reasonably put aggrieved parties on notice of the rule's content or clearly remained unripe for judicial review throughout the statutory review period." *Id.* at 615 (quotation omitted). *See also JEM Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C Cir. 1994). Domestic contends that nothing in the SuperMontage Approval Order gave adequate notice that decrementation would occur when ECNs decline orders because of unpaid access fees. Domestic asserts that it only learned of this aspect of decrementation when SuperMontage was field-tested in the summer of 2002. Consequently, Domestic reasons that it is excused from failing to file a timely petition for review of the SuperMontage Approval Order. We disagree.

In the SuperMontage Approval Order, the SEC explained the operation of decrementation in depth:

> If an order delivery ECN . . . declines or partially fills an order, or fails to respond in any manner within thirty seconds of order delivery, Nasdaq will immediately reroute the order (or unexecuted portion thereof) to the next Nasdaq Quoting Market Participant or UTP Exchange in the queue. *In addition, in the case of an order delivery ECN that has declined or partially filled an order without immediately transmitting a revised quote/order or that has failed to respond within 30 seconds, Nasdaq will zero out the ECN's quotes/orders at that price level on that side of the market.*

66 Fed. Reg. at 8027 (emphasis added).

This straightforward discussion leaves Domestic with no excuse for failing to raise its concern about decrementation. As an order delivery ECN familiar with ECNs' ability to decline trades, Domestic was reasonably placed on notice that an ECN's quote would be decremented when an ECN declines a trade *for any reason*. While the SEC did not list all the possible reasons an ECN might decline a trade (and thus have its quote decremented), it fairly notified ECNs that an ECN's quote would be decremented *whenever* it declines a trade, regardless of the motivation for the declination. This was more than enough to place Domestic on notice that if it declined to execute an order from a dealer that left its ECN access fees unpaid, the ECN's quote would be decremented to zero. Our conclusion that the SuperMontage Approval Order gave Domestic adequate notice of the Order's effect on order delivery ECNs is strengthened by the fact that the SEC included a similar discussion of decrementation in the initial publication of the proposed rules and in each subsequent republication of the rules. *See* 64 Fed. Reg. at 68,132; 65 Fed. Reg. at 16,986; 65 Fed. Reg. at 49,847; 65 Fed. Reg. at 69,090. Moreover, the SuperMontage Approval Order explained that decrementation is necessary, in the SEC's view, to avoid locked or crossed markets. 66 Fed. Reg. at 8046–47. This rationale supports decrementation regardless of the reason an ECN declines an order, including when declinations occur because of unpaid access fees. Thus, contrary to Domestic's assertion, the challenged aspect of decrementation was not "hidden" or "embedded in an algorithm." It was a necessary inference from the explicit text of the SuperMontage Approval Order. For these reasons, *RCA Global Communications, Inc. v. FCC*, 758 F.2d 722 (D.C. Cir. 1985), relied on by Domestic, is inapplicable here. In *RCA Global*, we held that a "fair reading" of the earlier order did not "permit[ ] the conclusion that [petitioner] did know or should have known that the Commission had confronted, much less resolved the issue RCA now petitions us to review." *Id.* at 730–31. Here, by contrast, a reasonable reader of the SuperMontage Approval Order could discern—without the "aid of telepathy," *id.* at 731—that the Commission resolved the

issue of decrementation for order delivery ECNs that decline trades because of unpaid access fees. We conclude, therefore, that Domestic was not excused from failing to file a timely petition for review of the SuperMontage Approval Order.

Accordingly, we dismiss Domestic's petition for lack of jurisdiction insofar as it challenges the decrementation aspect of SuperMontage.

B.  ADF Approval

We have jurisdiction over Domestic's petition insofar as it challenges the SEC's approval of the ADF in the SuperMontage Implementation Order. We reject that challenge, and deny that portion of the petition for review.

As explained above, the Commission required, as a condition to SuperMontage's implementation, the creation of an ADF to ensure that participation in SuperMontage would be voluntary. Specifically, the SuperMontage Approval Order required that the ADF (1) permit NASD members to satisfy their obligation (under the OHR and Regulation ATS) to display their best-priced quotes and limit orders without participating in SuperMontage and (2) "provide a market neutral linkage to the Nasdaq and other marketplaces, but not an execution service." In the Implementation Order, the Commission concluded that the ADF satisfied the conditions set forth in the SuperMontage Approval Order:

> The ADF . . . permits registered market makers and registered ECNs to display their best-priced quotes or customer limit orders . . . through the NASD. ADF market participants are required to provide other ADF market participants with direct electronic access to their quote. . . . The ADF also serves as a trade reporting and trade comparison facility. The ADF will therefore allow market participants to satisfy their order display and execution access obligations under the Order Handling Rules and Regulation ATS.

67 Fed. Reg. at 56,862.

Domestic primarily challenges the Commission's factual determination that the ADF was technologically sound

enough to satisfy the requirements set out in the SuperMontage Approval Order. The Commission's factual determination is conclusive if it is supported by substantial evidence, 15 U.S.C. § 78y(a)(4), and not otherwise arbitrary, capricious, or contrary to law, 5 U.S.C. § 706(2)(A) (2000). *See NASD, Inc.*, 801 F.2d at 1419. Moreover, we have long held that "[a]gency determinations based upon highly complex and technical matters are entitled to great deference." *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1035 (D.C. Cir. 2001) (quotations omitted). *See also Nat'l Petrochem. & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1145 (D.C. Cir. 2002) ("EPA is entitled to deference in its evaluation of technologies"); *Teledesic, L.L.C. v. FCC*, 275 F.3d 75, 84 (D.C. Cir. 2001) (extending heightened deference to FCC's judgment involving "technology and economics"); *Ctr. for Auto Safety v. Dole*, 828 F.2d 799, 803 (D.C. Cir. 1987) ("the court must accord the agency the appropriate degree of deference on such a record-based finding involving scientific and technological data"). Mindful of this deference, we consider Domestic's arguments.

We first note a crucial misconception that underlies–and ultimately undermines–Domestic's entire challenge to the Implementation Order. Domestic incorrectly assumes that the ADF was designed to ensure competition against SuperMontage in the trade execution market. Nothing in the SuperMontage Approval Order supports this contention. Indeed, the Commission explained that the sole purpose of the Facility was to provide an alternative outlet in which market participants that did not wish to use SuperMontage could fulfill their order display and trade reporting obligations under SEC regulations. 66 Fed. Reg. at 8024, 8049, 8053. The ADF is an "alternative *display* facility," not an alternative execution facility. Stripped of this argument, Domestic is reduced to challenging the SEC's conclusions about the technological feasibility of the ADF.

We conclude that the SEC relied on substantial evidence in its determination that the ADF was technologically capable of providing a genuine alternative to SuperMontage, in which ECNs could fulfill their order display and trade reporting obligations. Domestic contends that the ADF was inadequate

at the time of approval because it did not employ the Financial Information Exchange (FIX) protocol, which Domestic claims is the "standard industry protocol[ ] for financial market communications." Rather, the ADF employed the Exchange Transaction Protocol (XTP), which Domestic claims is "a somewhat obscure communications protocol." Consequently, Domestic reasons that it will be very expensive for ECNs and other market participants to connect to the ADF and to each other, thus undermining its function as an alternative to SuperMontage. The Commission addressed the XTP versus FIX issue in its July 24, 2002, ADF Pilot Order, which Domestic did not challenge. Therein, the SEC recognized that "[s]ome commenters criticized the ADF for not employing a FIX protocol," but "noted that the FIX protocol is not commonly used by other markets at this time." 67 Fed. Reg. at 49,849. But in approving the ADF, the SEC relied on the fact that "several ECNs have expressed an interest in fulfilling their quote display obligations through the ADF." 67 Fed. Reg. at 56,862. These expressions of interest support the SEC's conclusion that the ADF was a viable alternative to SuperMontage, notwithstanding the absence of FIX capability at the time of implementation. It is therefore obvious that the Commission considered the evidence and the alternatives presented to it. The making of policy decisions and the resolution of conflicting evidence is for the Commission, not the court. *See, e.g.*, *Diamond Walnut Growers, Inc. v. NLRB*, 113 F.3d 1259, 1270 (D.C. Cir. 1997) (courts "must . . . give genuine deference to [agencies'] factual findings and . . . legal/policy decisions implicit in the inferences drawn from those findings.").

In any event, NASD was obligated to provide the ADF, not to ensure that every market participant could link to the ADF and to each other without any cost to themselves. Domestic does not question the ADF's order display capacity, only its connectivity to market participants. While reasonable minds could differ as to whether these connectivity problems prevent the ADF from fulfilling its designated functions, the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding

from being supported by substantial evidence." *Schoenbohm v. FCC*, 204 F.3d 243, 246 (D.C. Cir. 2000). Accordingly, we hold that the SEC's approval of the ADF in the Implementation Order was supported by substantial evidence and was not arbitrary and capricious.

### III.  Conclusion

We lack jurisdiction over Domestic's petition insofar as it challenges the decrementation aspect of SuperMontage, because that portion of Domestic's petition is untimely. We deny Domestic's petition on the merits insofar as it challenges the Commission's approval of the ADF, because the Commission's order was supported by substantial evidence. For the foregoing reasons, the petition is dismissed in part and denied in part.

*So ordered.*