20-3188 (L)
*Town of Southold, et al. v. Wheeler, et al.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2021

(Argued: Friday, December 10, 2021       Decided: September 2, 2022)

Nos. 20-3188, 20-3189

_____

TOWN OF SOUTHOLD,

*Plaintiff-Intervenor-Appellant*,

ROSSANA ROSADO, in her official capacity as New York State Secretary of State,
BASIL SEGGOS, in his official capacity as Commissioner of the New York State
Department of Environmental Conservation, STATE OF NEW YORK,

*Plaintiffs-Appellants*,

COUNTY OF SUFFOLK,

*Plaintiff-Intervenor*,

-v.-

ANDREW WHEELER, in his official capacity as Administrator of the United States
Environmental Protection Agency, UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY, DENNIS DEZIEL, in his official capacity as Regional Administrator of
United States Environmental Protection Agency Region 1,

*Defendants-Appellees*,

CONNECTICUT DEPARTMENT OF ENERGY AND ENVIRONMENTAL PROTECTION,

*Defendant-Intervenor-Appellee.*[1]

_____

Before:        LIVINGSTON, *Chief Judge*, and CARNEY and BIANCO, *Circuit Judges*.

This dispute arises out of the efforts of the federal Environmental Protection Agency ("EPA") to designate a new waste disposal site on Long Island Sound for byproducts of local dredging activities. New York State and the Town of Southold, New York ("Southold," and together with New York, the "Plaintiffs-Appellants") challenged the EPA's designation of the site pursuant to the Administrative Procedure Act ("APA"), alleging, *inter alia*, violation of the Coastal Zone Management Act ("CZMA"). They now appeal from a July 20, 2020, judgment of the United States District Court for the Eastern District of New York (Korman, *J.*), granting Defendants-Appellees EPA and the Connecticut Department of Energy and Environmental Protection's cross-motions for summary judgment.

For the reasons set forth below, we hold, contrary to Plaintiffs-Appellants' claim, that the APA's arbitrary-and-capricious standard of review applies and that under that standard, the EPA's designation of the new disposal site passes muster under the CZMA. We also hold that Southold's claim under the National Environmental Protection Act is not properly before us. Accordingly, the judgment of the district court is **AFFIRMED**.

| | |
|---|---|
| For PLAINTIFF-INTERVENOR-APPELLANT: | SCOTT KREPPEIN, Devitt Spellman Barrett, LLP, Smithtown, NY. |
| For PLAINTIFFS-APPELLANTS: | ERIC DEL POZO, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, and Anisha S. Dasgupta, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney |

[1] The Clerk of Court is directed to amend the official caption as set forth above.

General of the State of New York, New York, NY.

For DEFENDANTS-APPELLEES:                  SEAN P. GREENE-DELGADO, Assistant United States Attorney (Varuni Nelson and Matthew Silverman, Assistant United States Attorneys, *on the brief*), *for* Mark J. Lesko, Acting United States Attorney for the Eastern District of New York, New York, NY.

For DEFENDANT-INTERVENOR-APPELLEE:         ROBERT D. SNOOK, Assistant Attorney General (Clare Kindall, Solicitor General, *on the brief*), *for* William Tong, Attorney General of the State of Connecticut, Hartford, CT.

For AMICI CURIAE:                          Linda L. Morkan, Robinson & Cole LLP, Hartford, CT, *for* The Connecticut Port Authority, Connecticut Marine Trades Association, Connecticut Maritime Coalition, Cross Sound Ferry Services, Inc., Electric Boat Corporation, Lower Connecticut River Valley Council of Governments, Connecticut Metropolitan Council of Governments, New Haven Port Authority, Southeastern Connecticut Council of Governments, South Central Regional Council of Governments, Western Connecticut Council of Governments, as *amici curiae* in support of Defendants-Appellees.

DEBRA ANN LIVINGSTON, *Chief Judge*:

Along the northern edge of "that slender riotous island which extends itself due east of New York," the aptly named Long Island, lies "the most domesticated body of salt water in the Western hemisphere, the great wet barnyard of Long Island Sound." F. SCOTT FITZGERALD, THE GREAT GATSBY 4–5 (Scribner 2004) (1925). This appeal concerns the efforts of the federal Environmental Protection Agency ("EPA") to designate a new waste disposal site in the Sound—a site for the byproducts of dredging activities undertaken to maintain and improve the Sound's shipping channels and ports, as well as support coastal businesses and other private parties.

The Coastal Zone Management Act ("CZMA") encourages states to develop programs to manage their coastal areas and requires federal activities that affect these areas to be "consistent to the maximum extent practicable with the enforceable policies" of each state's program. 16 U.S.C. § 1456(c)(1)(A). Regulations implementing the CZMA, in turn, have interpreted that phrase to require "full[] consisten[cy]" with state programs. 15 C.F.R. § 930.32(a)(1). Under these provisions, New York State formally objected to the EPA's proposed activity, asserting that the designation of the new dredging site would not be fully

4

consistent with its coastal management program and an analogous program developed by the Town of Southold, New York ("Southold," and together with New York, the "Plaintiffs-Appellants").  Responding to the objections, the EPA reiterated its conclusion that the designation would, in fact, be fully consistent with Plaintiffs-Appellants' coastal management programs.  After a lengthy dialogue in which New York refused to withdraw its objections, the EPA opted to proceed with the new site designation without New York's assent.

New York then sued in the United States District Court for the Eastern District of New York under the Administrative Procedure Act ("APA"), alleging that the agency's designation violates the Marine Protection, Research and Sanctuaries Act of 1972, 33 U.S.C. § 1411, ("MPRSA") and the CZMA.  Southold and the Connecticut Department of Energy and Environmental Protection ("Connecticut," and together with EPA, "Defendants-Appellees") intervened on behalf of New York and the EPA, respectively, and the parties cross-moved for summary judgment.  The district court (Korman, *J.*) granted Defendants-Appellees' motions.  *See Rosado v. Wheeler*, 473 F. Supp. 3d 115 (E.D.N.Y. 2020).  These appeals followed.

New York principally argues that the district court erred in applying the APA's deferential arbitrary-and-capricious standard for judicial review to its CZMA claim.[2] For the reasons set forth below, we reject that argument. And applying the arbitrary-and-capricious standard, we conclude that the district court properly granted Defendants-Appellees' cross-motions for summary judgment on the CZMA claims because the EPA adequately justified its consistency determination. We also conclude that Southold waived its claim that the EPA's designation of the new site violates the National Environmental Protection Act ("NEPA"). We therefore affirm the judgment of the district court.

## I. BACKGROUND

### A. Legal Background

Congress enacted the CZMA in 1972 to further the "national interest in the effective management, beneficial use, protection, and development of the coastal zone." 16 U.S.C. § 1451(a). The coastal zone is defined as "the coastal waters (including the lands therein and thereunder) and the adjacent shorelands . . . in

---

[2] New York does not challenge the district court's dismissal of its MPRSA claims on appeal and has thus abandoned them. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 294 (2d Cir. 2008).

proximity to the shorelines of the several coastal states." [3]   *Id.* § 1453(1).

Recognizing that then-existing "state and local institutional arrangements for planning and regulating land and water uses" in the coastal zone were "inadequate," *id.* § 1451(h), the Act sought "to encourage the states to exercise their full authority over the lands and waters in the coastal zone," *id.* § 1451(i).

To advance this objective, the CZMA gives states a key role in environmental regulation by allowing them to develop their own coastal zone management programs, which are subject to federal approval by the National Oceanic and Atmospheric Administration ("NOAA") in the Department of Commerce.   *See id.* § 1455(d).   Coastal zone management programs include "comprehensive statement[s] . . . prepared and adopted by the state in accordance with the provisions of [the CZMA], setting forth objectives, policies, and standards to guide public and private uses of lands and waters in the coastal zone."   *Id.* § 1453(12).

Once a state's program has been approved by NOAA, "[e]ach Federal agency activity . . . that affects . . . the coastal zone" is required to "be carried out in a manner which is consistent to the maximum extent practicable with the

---

[3] The term "coastal waters" includes "sounds," and the term "coastal states" includes any state bordering Long Island Sound.  16 U.S.C. § 1453(3)–(4).

7

enforceable policies of approved State management programs." *Id.* § 1456(c)(1)(A); *see also* 15 C.F.R. § 930.36(e)(2). NOAA regulations define "consistent to the maximum extent practicable" to mean "fully consistent with the enforceable policies of management programs unless full consistency is prohibited by existing law applicable to the Federal agency." 15 C.F.R. § 930.32(a)(1). The policies enumerated in a state's coastal management program need not be particularly detailed. NOAA regulations explain:

> An enforceable policy [in a State's coastal management program] shall contain standards of sufficient specificity to guide public and private uses. Enforceable policies need not establish detailed criteria such that a proponent of an activity could determine the consistency of an activity without interaction with the State agency. State agencies may identify management measures which are based on enforceable policies, and, if implemented, would allow the activity to be conducted consistent with the enforceable policies of the program.

*Id.* § 930.11(h).

A federal agency proposing to undertake an activity that affects a state's coastal zone must send the state a determination of whether the activity is consistent with the policies contained in the state's coastal management program "no . . . later than 90 days before final approval of the Federal activity." 16 U.S.C. § 1456(c)(1)(C); *see also* 15 C.F.R. § 930.36(b)(1). The state may then concur with or object to the federal agency's consistency determination. 16 U.S.C. § 1456(c)(3)(A).

8

Regulations issued by NOAA set forth a limited process for resolving a consistency dispute between a state and federal agency:

> In the event of an objection [to the Federal agency's consistency determination by a State agency], Federal and State agencies should use the remaining portion of the 90-day notice period (*see* § 930.36(b)) to attempt to resolve their differences.  If resolution has not been reached at the end of the 90-day period, Federal agencies should consider using the dispute resolution mechanisms of this part and postponing final federal action until the problems have been resolved.  At the end of the 90-day period the Federal agency shall not proceed with the activity over a State agency's objection unless:
>
> > (1) the Federal agency has concluded that under the "consistent to the maximum extent practicable" standard described in section 930.32 consistency with the enforceable policies of the management program is prohibited by existing law applicable to the Federal agency and the Federal agency has clearly described, in writing, to the State agency the legal impediments to full consistency (*See* §§ 930.32(a) and 930.39(a)), or
> >
> > (2) the Federal agency has concluded that its proposed action is fully consistent with the enforceable policies of the management program, *though the State agency objects*.

15 C.F.R. § 930.43(d) (emphasis added).  If the federal agency ultimately decides to proceed with the activity to which the state objects, the federal agency "shall notify the State agency of its decision to proceed before the project commences."  *Id.* § 930.43(e).

9

NOAA regulations "describe mediation procedures which Federal and State agencies may use to attempt to resolve serious disagreements which arise during the administration of approved management programs." *Id.* § 930.110; *see also id.* § 930.44 ("In the event of a serious disagreement between a Federal agency and a State agency regarding the consistency of a proposed federal activity affecting any coastal use or resource, either party may request the . . . mediation services provided for in [15 C.F.R. § 930.110, *et seq.*]"). The regulations contemplate two avenues of mediation: informal mediation by NOAA's Office of Ocean and Coastal Resource Management, *see id.* § 930.111, and formal mediation by the Secretary of Commerce (the "Secretary"), *see id.* § 930.112. A state or federal agency can decline the Secretary's invitation to engage in mediation, *see id.* § 930.112(b), or unilaterally withdraw from mediation at any point, *see id.* § 930.115(b). And state and federal agencies need not exhaust the mediation process described above to seek judicial review. NOAA regulations provide:

> The availability of the mediation services provided in this subpart is not intended expressly or implicitly to limit the parties' use of alternate forums to resolve disputes. Specifically, judicial review where otherwise available by law may be sought by any party to a serious disagreement without first having exhausted the mediation process provided for in this subpart.

*Id.* § 930.116.

10

Finally, the CZMA provides that the President of the United States may exempt a federal agency from the requirement that its actions be consistent with a state's coastal management program.

> After any final judgment, decree, or order of any Federal court that is appealable under section 1291 or 1292 of title 28, or under any other applicable provision of Federal law, that a specific Federal agency activity is not in compliance with subparagraph (A), and certification by the Secretary that mediation under subsection (h) is not likely to result in such compliance, the President may, upon written request from the Secretary, *exempt from compliance those elements of the Federal agency activity that are found by the Federal court to be inconsistent with an approved State program*, if the President determines that the activity is in the paramount interest of the United States.

16 U.S.C. § 1456(c)(1)(B) (emphasis added).

## B.    Factual Background

Dredging involves the excavation of materials that accumulate on the ocean floor over time. Periodic dredging is essential for the maintenance and improvement of coastal navigation infrastructure, including channels, navigable rivers, harbors, and marinas. Some dredged materials, considered "beneficial," can be used to replenish beach sand, construct wetlands, and cap landfills. Others, however, cannot be put to beneficial use and must be disposed of in open waters. Such open-water disposal is often controversial because dredged materials "may

11

be contaminated by municipal or industrial wastes or by runoff from terrestrial sources such as agricultural lands." 40 C.F.R. § 227.13(a).

Long Island Sound is a 110-mile-long tidal estuary that lies between New York, Connecticut, and Rhode Island. The Sound is bounded by the Atlantic Ocean to the east and the East River tidal strait to the west, and the border between Connecticut and New York runs from east to west through the center of the Sound. Over 200 harbors, coves, bays, and navigable rivers around the Sound require periodic dredging. The Army Corps of Engineers (the "Corps") is responsible for fifty-two maintenance and improvement projects in the Sound and adjacent waters, and many other federal and non-federal projects in the area maintain and improve marinas, boat yards, and coastal businesses.

New York submitted a coastal management program to NOAA in August 1982.[4] NOAA approved that program, thus "activat[ing] Federal agency responsibility for being consistent with" its policies. Approval of the New York Coastal Zone Management Program, 47 Fed. Reg. 47,056, 47,056 (Oct. 22, 1982). Two components of New York's coastal management program are relevant to this

---

[4] *See* NEW YORK STATE COASTAL MANAGEMENT PROGRAM AND FINAL ENVIRONMENTAL IMPACT STATEMENT 4, https://dos.ny.gov/system/files/documents/2021/04/ny_cmp_dec2020_w-bookmarks_working_topost.pdf.

appeal: the Long Island Sound Coastal Management Program, which New York authored in 2002 (the "New York Program"), and the Town of Southold Local Waterfront Revitalization Program, which was adopted by the Town of Southold, New York, in 2005 (the "Southold Program") and was "formally approved and incorporated into [the New York Program]." Joint App'x 3107.

### 1. The Western and Central Sites

While this dispute concerns the EPA's designation of a dredged material disposal site in the *eastern* portion of Long Island Sound, there are existing designated sites in the Sound's western and central portions that we refer to, respectively, as the "Western Site" and the "Central Site." The EPA first published a Notice of Intent to consider designating dredged material disposal sites in the Sound's waters in 1999. *See* Designation of Dredged Material Disposal Sites in Long Island Sound, Connecticut and New York, 64 Fed. Reg. 29,865, 29,865 (June 3, 1999). Four years later, the EPA published a proposed rule seeking to designate the Western and Central Sites. *See* Proposed Designation of Dredged Material Disposal Sites in the Central and Western Portions of Long Island Sound, CT, 68 Fed. Reg. 53,687, 53,687 (Sept. 12, 2003). New York initially objected to the EPA's determination that the Western and Central Site designations would be

13

consistent with the New York Program, as required under the CZMA. After a period of negotiation, however, the state and the agency agreed to a set of site use restrictions that would "apply to all federal projects, and non-federal projects generating more than 25,000 cubic yards of dredged material" but would "not apply to smaller non-federal projects." Designation of Dredged Material Disposal Sites in Central and Western Long Island Sound, CT, 70 Fed. Reg. 32,498, 32,511 (June 3, 2005).

As relevant here, the restrictions contemplated that the Corps would develop a Dredged Materials Management Plan ("DMMP") for the Sound, a "comprehensive stud[y] carried out by the [Corps], in consultation with the EPA and the affected states, to help manage dredged material in a cost-effective and environmentally acceptable manner." *Id.* The EPA agreed that the DMMP for the Sound would address the Sound's future dredging needs and the "development of procedures and standards for the use of practicable alternatives to open-water disposal" of dredged material "to reduce [it] wherever practicable." *Id.* Once an agreement was in place as to the proposed restrictions, New York withdrew its objection and concurred with the EPA's conclusion that the agency's designation of the Central and Western Sites would be consistent with the New York Program.

14

The EPA published a final rule in June 2005 that designated the Western and Central Sites and incorporated New York's restrictions. *Id.* at 32,498, 32,511.

Over a decade later, in December 2015, the Corps completed the DMMP. The DMMP "examine[s] possible alternatives to open water placement of dredged material in Long Island Sound and compare[s] the costs and benefits of such alternatives with . . . current practice." Joint App'x 4002. It aims "to provide a 30 year management strategy to add certainty to dredging and placement activities . . . within the Region in an environmentally acceptable and economically practicable manner." *Id.* at 4084. The DMMP estimates that federal, state, local, and private dredging activities in the Sound will generate roughly 53 million cubic yards of dredged material over the 30-year period from 2015 through 2045, approximately 34 million of which will be fine-grained materials suitable for open-water disposal. It notes, however, that "only a portion" of the dredged materials will "likely . . . be dredged in that period, as future actions are contingent on Federal and non-Federal budget decisions." *Id.* at 3952.

## 2. The Eastern Site

Before the designation of the dredged material disposal site at issue here, no long-term disposal site existed in the eastern portion of the Sound. Two

15

preexisting disposal sites in the eastern Sound—the New London Disposal Site (the "New London Site") and the Cornfield Shoals Disposal Site (the "Cornfield Shoals Site")—had been authorized only for temporary use and were scheduled to close in December 2016.[5] In 2012, the EPA began exploring whether a new long-term disposal site should be designated to service the eastern Sound.

After screening eleven potential sites and a "no action alternative," the EPA proposed designating a disposal site in the eastern Sound (the "Eastern Site"). Designation of a Dredged Material Disposal Site in Eastern Region of Long Island Sound; Connecticut, 81 Fed. Reg. 24,748, 24,761 (Apr. 27, 2016). The Eastern Site would comprise the western half of the existing New London Site and two new adjacent areas to its west. The agency proposed that the Eastern Site would be governed by the same site use restrictions that it had agreed to with respect to the Western and Central Sites. When New York expressed concern to the EPA about the Eastern Site, the agency asked the Corps to examine the dredged material disposal needs of the eastern portion of the Sound in greater detail. In response, the Corps revised the DMMP, estimating the need for open-water disposal

---

[5] The New London and Cornfield Shoals Sites were initially set to close in December 2011, but Congress extended the deadline to December 2016 so that the EPA had additional time to evaluate whether to designate a long-term disposal site in the Sound's eastern portion.

capacity in the eastern Sound over the next thirty years to be 20.2 million cubic yards.

In July 2016, the EPA submitted a consistency determination pursuant to the CZMA, asserting that the Eastern Site designation would be fully consistent with the enforceable policies of the New York and Southold Programs. New York disagreed and formally objected to the agency's consistency determination in October 2016. It argued that the Eastern Site designation would be inconsistent with the New York Program and with Policies 5 (water quality), 6 (ecosystem protection), 8 (hazardous waste management), 10 (water-dependent uses), and 11 (living marine resources) of the Southold Program.[6]

The EPA responded to New York's objection in November 2016, concluding that the State's arguments were "unfounded" and that the Eastern Site designation would, in fact, be fully consistent with both Programs. Joint App'x 3222. The agency explained that it "considered whether to seek mediation assistance from NOAA . . . to address this CZMA dispute . . . but . . . decided against" that course because the mediation process might be "lengthy." *Id.* at 3223–24. The EPA

---

[6] New York asserted to the EPA that it was "bound by the terms of the CZMA" to object to the EPA's designation of the new disposal site on Southold's behalf because the Southold Program has been incorporated into the New York Program. Joint App'x 3107.

17

therefore concluded "that it is necessary to proceed with the site designation at this point" despite the ongoing consistency dispute with New York. *Id.* at 3224. Later the same day, the EPA issued a final rule formally designating the Eastern Site as a permanent disposal site under the MPRSA. *See* Designation of a Dredged Material Disposal Site in Eastern Region of Long Island Sound; Connecticut, 81 Fed. Reg. 87,820, 87,820 (Dec. 6, 2016). The rule became effective on January 5, 2017. *See id.* at 87,821.

## C. Procedural History

New York sued the EPA in August 2017 and filed the operative complaint in October 2017. New York raised five claims under the APA—four alleging violations of the MPRSA and the fifth alleging a CZMA violation. The State of Connecticut moved to intervene as a defendant, and Southold moved to intervene as a plaintiff. The district court granted both motions.[7]

The parties then cross-moved for summary judgment on the plaintiffs' claims alleging violation of the MPRSA and the CZMA. The plaintiffs advanced several arguments under the MPRSA: (1) that the EPA's determination that a new site was needed in the eastern Sound was arbitrary and capricious; (2) that the EPA

---

[7] Suffolk County also intervened below as a plaintiff but did not appeal.

18

failed to adequately consider whether the Eastern Site would interfere with shipping and navigation on the Sound; (3) that the EPA's decision to designate the new Eastern Site rather than relying on preexisting disposal sites was arbitrary and capricious; and (4) that the EPA had failed to consider the potential pollution arising from the disposal of non-federal projects of less than 25,000 cubic yards. The plaintiffs also asserted that the Eastern Site designation violated the CZMA because it was not consistent to the maximum extent practicable with the New York and Southold Programs.

The district court (Korman, *J.*) denied the plaintiffs' motions for summary judgment and granted Defendants-Appellees' cross-motions in July 2020. The bulk of the district court's opinion addressed whether the EPA's designation of the Eastern Site pursuant to the MPRSA was arbitrary and capricious under the APA. Applying that deferential standard of review, the district court upheld the agency's action.

The district court then turned to the plaintiffs' allegation that the CZMA had been violated. The district court rejected that claim, drawing on its analysis of the alleged MPRSA violations because "New York rest[ed] its CZMA claim largely on the 'same conduct and actions upon which [its MPRSA] claims for relief' are based."

19

*Rosado*, 473 F. Supp. 3d at 146 (quoting N.Y. Summ. J. Br., District Court Dkt. No. 71-1, at 84). The district court concluded that "New York has not offered any additional viable explanations for how EPA's designation of the Eastern Site is inconsistent with [the New York or Southold] Programs." *Id.* The district court entered judgment for Defendants-Appellees on July 20, 2020, and Plaintiffs-Appellants timely appealed.

## II.    DISCUSSION

### A.    Standard of Review

"On appeal from a grant of summary judgment involving a claim brought under the [APA], we review the administrative record *de novo* without according deference to the decision of the district court." *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007). "Under the APA, courts review agency action to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Animals v. Romero*, 948 F.3d 579, 585 (2d Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)). Under this "narrow" standard of review, a "court is not empowered to substitute its judgment for that of the agency." *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1554 (2d Cir. 1992) (quoting *Citizens to Pres. Overton Park v.*

20

*Volpe*, 401 U.S. 402, 416 (1971)). Rather, a court will overturn an agency's determination only

> when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Karpova*, 497 F.3d at 267–68 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

> In other words, so long as the agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action, even a decision that is not perfectly clear, provided the agency's path to its conclusion may reasonably be discerned.

*Id.* at 268.

New York contends on appeal that the district court erred in applying arbitrary-and-capricious review to the CZMA claim. We disagree. At the start, New York argued below that the EPA's consistency determination was "arbitrary and capricious." N.Y. Summ. J. Br. 84. New York's argument that the district court erred by applying that standard of review is thus arguably waived. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 124 n.29 (2d Cir. 2005) ("[W]here a party

has shifted his position on appeal and advances arguments available but not pressed below, waiver will bar raising the issue on appeal." (citation, internal quotation marks, and alteration omitted)).

In any event, we conclude that the district court correctly applied the arbitrary-and-capricious standard to Plaintiffs-Appellants' CZMA claim. New York advances several counterarguments on appeal, but none is persuasive. First, New York notes that the CZMA requires that federal agency action "be carried out in a manner which is consistent to the *maximum extent* practicable with the enforceable policies of approved State management programs." 16 U.S.C. § 1456(c)(1)(A) (emphasis added); *see also* 15 C.F.R. §§ 930.32(a)(1), 930.36(e)(2). But this provision is not a standard of review. And New York does not argue that the CZMA or its accompanying regulations set forth a standard of review to displace the APA's arbitrary-and-capricious standard. *See N.Y. Pub. Int. Rsch. Grp., Inc. v. Johnson*, 427 F.3d 172, 179 (2d Cir. 2005) (explaining that when a statute "does not provide a standard of review," we typically "review [the agency's] actions under the Administrative Procedure Act . . . , which contemplates setting aside only agency actions that are 'arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A))); *see also*

*Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 496–97 (2004).

Indeed, because the CZMA does not provide a standard of review, courts have routinely subjected CZMA claims to arbitrary-and-capricious review. *See, e.g.*, *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1144 (9th Cir. 2000) ("The 'arbitrary or capricious' standard is appropriate for resolutions of factual disputes implicating substantial agency expertise." (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376–77 (1989))); *Del. Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 286–87 (3d Cir. 2012); *City of Riverview v. Surface Transp. Bd.*, 398 F.3d 434, 439–40 (6th Cir. 2005); *Am. Petroleum Inst. v. Knecht*, 609 F.2d 1306, 1310 (9th Cir. 1979); *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205, 1222 (9th Cir. 2004) (reasoning that a court should "not generally overturn a consistency determination [under the CZMA] just because we might have come to a different conclusion were the determination of 'consistency' before us in the first instance" (citing *Overton Park*, 401 U.S. at 416)). And we are unpersuaded that the CZMA's requirement that federal agency action be "consistent to the maximum extent practicable with the enforceable policies of approved State management programs" draws these decisions into question. 16 U.S.C. § 1456(c)(1)(A).

Next, New York contends that we must review the EPA's consistency determination *de novo* because the EPA does not "administer" the CZMA. N.Y. Br. 37. But this argument conflates arbitrary-and-capricious review with a different doctrine—*Chevron* deference—which does not apply here. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). "We evaluate challenges to an agency's interpretation of a statute that it administers within the two-step *Chevron* deference framework," *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 507 (2d Cir. 2017), but review an agency's "interpretation of . . . a statute that it does not administer[] *de novo*," *N.Y. State Dep't of Env't Conservation v. FERC*, 884 F.3d 450, 455 (2d Cir. 2018). "When the question is not one of the agency's authority but of the reasonableness of its actions," however, "the 'arbitrary and capricious' standard of the APA governs." *N.Y. Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 324 (2d Cir. 2003); *see also Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011) (observing that when the challenged agency action "is not an interpretation of any statutory language," "the more apt analytic framework . . . is standard 'arbitrary or capricious' review under the APA" (brackets omitted)); *Hong v. U.S. Sec. & Exch. Comm'n*, 41 F.4th 83, 93 n.12 (2d Cir. 2022) ("us[ing] the *Chevron* framework to address the statutory interpretation questions presented"

24

there but separately evaluating whether "the agency's *application* of the statute and regulations . . . was arbitrary or capricious").

This case does not implicate the *Chevron* doctrine because New York does not challenge the EPA's "authority" to render a consistency determination or its interpretation of the CZMA. Instead, it challenges the "reasonableness" of the EPA's consistency determination under that statute. *N.Y. Pub. Int. Rsch. Grp.*, 321 F.3d at 324. Put another way, New York challenges the EPA's "application" of the CZMA in its consistency determination. *Hong*, 41 F.4th at 93 n.12 (emphasis omitted). And so "the 'arbitrary and capricious' standard of the APA governs." *N.Y. Pub. Int. Rsch. Grp.*, 321 F.3d at 324.

For similar reasons, we reject New York's argument that we must review the EPA's consistency determination *de novo* because it has alleged that this determination was "'not in accordance with' the CZMA." N.Y. Br. 33 (quoting 5 U.S.C. § 706(2)(A)). The Supreme Court rejected a materially identical argument in *Marsh*. In that case, the respondents argued that "strict review is appropriate under the 'in accordance with law' clause of § 706(2)(A)" because they "maintain[ed] that the question for review centers on the legal meaning of [a statutory] term" in NEPA "or, in the alternative, the predominantly legal question

25

whether established and uncontested historical facts presented by the administrative record satisfy this standard." *Marsh*, 490 U.S. at 376. But the Court rejected that "[c]haracteriz[ation]" of the dispute because the respondents' challenge did not turn on NEPA's "meaning" or any other "predominantly legal" question but instead "involve[d] primarily issues of fact." *Id.* at 376–77. And because "analysis of the relevant documents" for the respondents' NEPA claim "require[d] a high level of technical expertise," the Court held that it "must defer to 'the informed discretion of the responsible federal agencies.'" *Id.* at 377 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)). The *Marsh* Court therefore concluded that "review of the narrow question before [it] whether the [agency's] determination . . . should be set aside is controlled by the 'arbitrary and capricious' standard of § 706(2)(A)." *Id.* at 376; *see also J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 391 (2d Cir. 2000) (explaining that "[u]nder the APA, this Court reviews errors of law de novo" but reviews "other agency findings, conclusions, and actions" under the arbitrary-and-capricious standard).

*Marsh*'s reasoning applies here. *See Akiak*, 213 F.3d at 1144 (applying *Marsh* to a CZMA claim). Like that case, this case does not turn on predominantly legal issues, such as the EPA's interpretation of the CZMA. It depends instead on the

26

fact-specific question of whether the EPA adequately responded to New York's objections to its consistency determination. So as in *Marsh*, "[t]he question presented for review in this case is a classic example of a factual dispute the resolution of which implicates substantial agency expertise." 490 U.S. at 376. Thus, we follow *Marsh*'s lead in rejecting Plaintiffs-Appellants' "supposition that review is of a legal question and that the [EPA's] decision 'deserves no deference.'" *Id.* at 377.

*Scheduled Airlines Traffic Offices, Inc. v. DOD*, on which New York relies, in fact illustrates why the APA's "not in accordance with law" standard is *inapplicable* here. *See* 87 F.3d 1356, 1361 (D.C. Cir. 1996). That case involved "a pure question of statutory interpretation independent of the complex factual determinations or policy judgments particularly within agencies' expertise." *Id.* For that reason, the court held that the issue there was "not whether the Department acted arbitrarily or capriciously, . . . but rather whether it acted 'in accordance with [federal] law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)) (alteration in original). And because "the Defense Department ha[d] not been entrusted to administer" the statute at issue in the case, the court reviewed the agency's interpretation *de novo*. *Id.*; *cf. Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002) ("In reviewing an agency's

27

statutory interpretation under the APA's 'not in accordance with law' standard, we adhere to the familiar two-step test of *Chevron*, provided that the conditions for such review are met."). But unlike *Scheduled Airlines Traffic Offices*, this case turns on "complex factual determinations," not "a pure question of statutory interpretation." 87 F.3d at 1361. Thus, the arbitrary-and-capricious standard applies.

Nor does the presidential waiver provision found in 16 U.S.C. § 1456(c)(1)(B) imply, as New York contends, N.Y. Br. 44, that the CZMA forecloses arbitrary-and-capricious review. Section 1456(c)(1)(B) simply provides that *if* a federal court concludes that an agency's consistency determination was erroneous, the Secretary can seek a waiver of the CZMA's consistency requirement from the President. But this provision does not alter the standard of review by which a court determines *whether* a consistency determination was in error.

**B.    Application**

Because we conclude that the arbitrary-and-capricious standard governs here, we apply that standard in reviewing Plaintiffs-Appellants' claims on the merits. Plaintiffs-Appellants argue that the district court erred by upholding the EPA's determination that its designation of the Eastern Site is consistent to the

maximum extent practicable with the New York and Southold Programs. Southold also challenges the adequacy of the Environmental Impact Statement that the EPA submitted pursuant to NEPA in support of its designation. For the reasons set forth below, we reject these claims.

1. **New York's Claims**

New York generally asserts that the EPA's designation of the Eastern Site is inconsistent with the following policies of the New York Program:

> to "[p]rotect water quality of coastal waters from adverse impacts associated with excavation, fill, dredging, and disposal of dredged material" (Policy 5, Sub-Policy 5.3); to work towards "reduction or elimination of adverse impacts associated with existing development" (Policy 6, Sub-Policy 6.1); to "[a]void placement of dredged material in Long Island Sound when opportunities for beneficial reuse of the material exist" (Policy 10, Sub-Policy 10.6); and to promote "marine resources by . . . protecting spawning grounds, habitats, and water quality" (Policy 11, Sub-Policy 11.1).

N.Y. Br. 50 (alterations and omission in original) (citations omitted); *see also* Joint App'x 3241–42. But the specific arguments that New York raises on appeal pertain only to Sub-Policy 10.6 of the New York Program, entitled "Provide sufficient infrastructure for water-dependent uses." That policy states:

> Use suitable dredged material for beach nourishment, dune reconstruction, or other beneficial uses. Avoid placement of dredged material in Long Island Sound when opportunities for beneficial reuse of the material exist. Allow placement of suitable dredged

29

material in nearshore locations to advance maritime or port-related functions, provided it is adequately contained and avoids negative impacts on vegetated wetlands and significant coastal fish and wildlife habitats. Avoid shore and water surface uses which would impede navigation.

Joint App'x 3214–15.

Relying on Sub-Policy 10.6, New York argues that the EPA did not adequately respond to four of its objections to the EPA's consistency determination: (1) that a new dredging site was not needed in the eastern Sound because the Western and Central Sites have adequate capacity to fulfill the Sound's dredging requirements, (2) that the EPA improperly considered a lack of funding in its consistency determination, (3) that certain waste materials disposed of at the Eastern Site could be subject to environmentally harmful "capping" practices, and (4) that the EPA unreasonably included site use restrictions based on the restrictions for the Western and Central Sites. We are not persuaded. As explained below, the EPA adequately responded to each of these objections.

First, New York argues that the EPA failed to adequately respond to its objection that the Eastern Site is unnecessary because the Western and Central

Sites have adequate capacity to fulfill the Sound's dredging requirements for the next several decades.[8] But the EPA explained that

> [d]isposal capacity at the [Western Site] and [Central Site] does not obviate the need for the [Eastern Site]. [The Corps] projected in the DMMP that dredging in Long Island Sound would generate . . . 49.6 [million cubic yards or "mcy"] of material that could potentially need to be placed at an open-water disposal site. . . .
>
> . . . [T]he [Central Site] and [Western Site] are each estimated to have a disposal capacity of about 20 mcy. This 40 mcy of capacity is not enough to take the entire 49.6 mcy of material that *could* require open-water disposal.

*Id.* at 3243–44. And it cautioned that

> it must be understood that estimates of the amounts of material of different types needing to be managed in the future are unavoidably imperfect. The actual amount of material that will require management could be higher (or lower) over the 30-year planning horizon. This is especially evident when unpredictable events, such as large storms and possible improvement dredging projects, are considered.

---

[8] The EPA argues that New York waived this argument by failing to raise it before the district court. As noted above, "where a party has shifted his position on appeal and advances arguments available but not pressed below, waiver will bar raising the issue on appeal." *Wal-Mart Stores*, 396 F.3d at 124 n.29 (citation, internal quotation marks, and alteration omitted). Before the district court, New York argued that the EPA's designation of the Eastern Site is inconsistent with Policy 5 and Sub-Policy 5.3 of the New York Program because there is no need for the Eastern Site. New York did not argue that the designation would be inconsistent with Sub-Policy 10.6 for that reason. Nonetheless, because New York's argument on appeal sufficiently resembles the argument that it advanced before the district court, we do not agree that New York has waived it.

*Id.* at 3245.

Although New York acknowledges that the Corps estimated that the Sound could generate up to 49.6 million cubic yards of dredged material requiring open-water disposal in the coming decades and that the total capacity of the Western and Central Sites was only 40 mcy, the State notes that the 49.6 figure included 15.5 million cubic yards[9] of dredged sand that might be put to "beneficial use, such as beach renourishment." N.Y. Br. 18.[10] So New York contends that the EPA should have subtracted out that 15.5 mcy from the topline 49.6 estimate, which would have led it to conclude that the Western and Central Sites had adequate capacity to accept all the dredged material the Corps projected the Sound would generate in the coming decades.

The EPA adequately responded to this objection. It reasoned, first, that there was "no guarantee" that it could find a beneficial use for dredged material

[9] We observe that New York's brief is inconsistent as to the amount of dredged sand that could be amenable to a beneficial use. *Compare* N.Y. Br. 27–28, 50–51 (15.2 million cubic yards), *with id.* at 18 (15.5 million cubic yards). The record also appears inconsistent on this point. The Corps apparently reported this figure as 15.5 million cubic yards, *see* Joint App'x 3968–69, but the EPA later stated that the Corps had reported it as 15.2 million cubic yards, *see* Joint App'x 3243–44. Because this discrepancy does not affect our conclusions, we use 15.5 million cubic yards without further discussion.

[10] The Corps also estimated that 3.3 million cubic yards of dredged material would be contaminated with dangerous toxins and so would be unsuitable for open-water disposal. Joint App'x 3969.

from the Sound. Joint App'x 3244. The agency also noted that because the 49.6 million cubic yards figure was an estimate, the Sound might generate even more dredged material that would require additional disposal capacity. And the EPA's determination that the Eastern Site was necessary did not rest solely on an estimate of the quantity of dredged material the Sound might generate. As the agency explained:

> Beyond the question of disposal capacity, when EPA took into account overall environmental effects, environmental and safety risks, logistical difficulties, and the expense of using such distant sites, EPA concluded that the [Central Site], [Western Site], and [Rhode Island Sound Disposal Site (the "RI Site")] would not reasonably serve the needs of the eastern Long Island Sound region. A key consideration in EPA's determination that a designated site is needed in eastern Long Island Sound is that going outside the region would involve far longer transit distances from dredging centers in the eastern Sound.

*Id.* at 3245. For those reasons, the EPA's conclusion that it was "reasonable and prudent to designate sites to ensure adequate disposal capacity is available for all the projected material" was not arbitrary and capricious. *Id.*

Second, New York argues that the EPA improperly "invoked the cost savings of having a dumping site proximate to dredging centers in the Eastern Sound" as a "benefit" of designating the Eastern Site. N.Y. Br. 53. That

33

consideration, New York contends, violates 15 C.F.R. § 930.32(a)(3), which

provides:

> Federal agencies shall not use a general claim of a lack of funding or insufficient appropriated funds or failure to include the cost of being fully consistent in Federal budget and planning processes as a basis for being consistent to the maximum extent practicable with an enforceable policy of a management program.

New York misstates the nature of the cost considerations that the EPA considered.

In responding to New York's objections, the EPA explained:

> Finally, longer haul distances also would increase the cost both to taxpayers and private entities of completing dredging projects. Using the [Central Site], [Western Site], or [RI Site] would greatly increase the transport distance for, and duration of, open-water disposal for dredging projects from the eastern Long Island Sound region. This, in turn, would greatly increase the cost of such projects. It could also render certain dredging projects too expensive to conduct. . . . EPA is *not* designating the [Eastern Site] solely in order to make dredging less expensive, but it would be irrational to ignore that reducing the cost of necessary dredging is another of the many benefits of designating the [Eastern Site], a site which EPA has determined to be environmentally sound, instead of relying on more distant sites.

Joint App'x 3246. Thus, the EPA did not rely on the agency's *own* cost

considerations to support its consistency determination. It instead outlined the

costs that would accrue *to taxpayers and private enterprises* from a failure to

designate the new site. While 15 C.F.R. § 930.32(a)(3) prevents a federal agency

from using its own budgetary constraints as an excuse to avoid complying with a

34

state's coastal management program, it does not compel the agency to pursue activities that it deems economically wasteful.

Third, New York argues that the EPA ignored its objection that toxic "material from smaller nonfederal projects dumped at the Eastern site could be subject to capping," N.Y. Br. 57–58, a process that involves "using relatively cleaner material to cover relatively less clean material and, thus, isolate the latter from the environment," Joint App'x 3258. The State asserts that dredged material is "often laden" with "toxins," and that nonfederal projects generating less than 25,000 cubic yards of dredged material are subject only to the Clean Water Act ("CWA") rather than the "more stringent" standards of the MPRSA. N.Y. Br. 57.

The EPA explicitly addressed this objection in its November 4, 2016, response letter. The EPA explained that New York's objection rests on a "misguided understanding" of the proposed designation of the Eastern Site. Joint App'x 3258. The agency "would *not* approve of the disposal of toxic sediments at the [Eastern Site] on the grounds that it could later be capped with cleaner material" because "MPRSA regulations clearly dictate that only 'suitable' material may be placed at an open-water disposal site regulated under the MPRSA," and a

35

proposal to "cap" unsuitable material with cleaner material "does not change that."

*Id.*

New York asserts that the EPA's response was inadequate because it failed to address the prospect that "capping" may still occur for smaller, nonfederal projects subject to regulation under the CWA rather than the "more stringent" MPRSA standards. N.Y. Br. 57. But that amounts to an argument that the CWA, which indisputably applies to those projects, does not adequately regulate capping. And as the EPA persuasively argues, that objection lies "with Congress, not EPA." EPA Br. 44. The EPA notes, moreover, that concerns about capping in any hypothetical future project can be addressed during the individual permitting process.

New York also contends that the EPA cannot now respond to New York's argument about small, nonfederal projects because it failed to do so during the notice-and-comment process. *See Michigan v. EPA*, 576 U.S. 743, 758 (2015) ("[A] court may uphold agency action only on the grounds that the agency invoked when it took the action."). But New York, too, did not raise the issue of small, nonfederal projects during the notice-and-comment process, and arbitrary-and-capricious review does not require that an agency respond in advance to every

36

hypothetical objection that might be raised. *See Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) ("It is black-letter administrative law that absent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue." (citation, internal quotation marks, and alteration omitted)).

Finally, New York argues that the EPA erred by "unilaterally" adding conditions to the proposed Eastern Site "and then rely[ing] on those restrictions as evidence of consistency under the CZMA despite the State's objection." N.Y. Br. 61. New York claims that the agency "transpose[d] negotiated restrictions for the Central and Western sites onto the Eastern site, and then use[d] them as a basis for nullifying New York's objection to the Eastern site." N.Y. Reply Br. 33. But the EPA never asserted that the additional site restrictions render its designation of the Eastern Site consistent with the New York Program on their own. Rather, in responding to New York's objections, the agency explained:

> Applying these site use restrictions to the [Eastern Site] should be equally acceptable because the restrictions apply equally well to the eastern Sound and applying the same restrictions across the entire Sound makes good sense. As a result, the entire Sound will be covered by the same regulatory regime applied by the same federal and state regulators.

Joint App'x 3223. New York therefore fails to show that the EPA's decision to impose additional restrictions on the Eastern Site undermines the agency's efforts to achieve full consistency with the New York Program.

### 2.    Town of Southold's Claims

In a separate brief, Southold challenges the EPA's determination that its designation of the Eastern Site is fully consistent with the Southold Program. Southold also contends that the EPA violated NEPA in designating the Eastern Site.  As explained below, we conclude that the EPA's determination that its activity is fully consistent with the Southold Program is not arbitrary and capricious, and that Southold's NEPA claim is waived.

#### i.    CZMA

Southold begins by arguing that the EPA's designation of the Eastern Site is inconsistent with several policies enumerated in the Southold Program.  First, Southold claims that the EPA's designation conflicts with Sub-Policy 5.3 of the Southold Program, entitled "Protect and enhance quality of coastal waters."  It provides:

> A.  Protect water quality based on an evaluation of physical factors (pH, dissolved oxygen, dissolved solids, nutrients, odor, color and turbidity), health factors (pathogens, chemical contaminants, and

toxicity), and aesthetic factors (oils, floatables, refuse, and suspended solids).

C.  Protect water quality of coastal waters from adverse impacts associated with excavation, fill, dredging, and disposal of dredged material.

*Id.* at 3252–53.  Southold asserts, without elaboration, that "[c]oncerns regarding [the] extent of the testing and protocols used were raised repeatedly . . . without a satisfactory response."  Southold Br. 27.  The record demonstrates, however, that the EPA adequately responded to Southold's concerns about the Eastern Site's effect on the Sound's water quality.  The agency noted that designating a new disposal site does not affect water quality; only individual projects, which require a permit, can do so.  *See* Joint App'x 3254.  So, the EPA explained, Southold's concerns about water quality can be addressed in the permitting process for any hypothetical future project.   And the agency reasoned that "the sediment suitability criteria in EPA's MPRSA regulations require the assessment of physical, health and aesthetic factors," ensuring that the designation of the Eastern Site is consistent with the Southold Program.  *Id.*  Taken together, these two responses adequately addressed Southold's water-quality objection.

Second, Southold argues that the EPA's site designation conflicts with Sub-Policy 6.1 of the Southold Program, which emphasizes protecting "ecological

quality." *Id.* at 3260–61. But the agency explained in detail how the Eastern Site designation would comport with that policy. The EPA highlighted "the aspects of [its] analysis relating to chemistry, toxicity, bioaccumulation, benthic health, aquatic organism impacts, and bathymetry, all of which contribute to the assessment of possible physical, chemical, and biological changes if the site is designated." *Id.* at 3262. Indeed, the agency noted, "[b]enthic analyses within . . . the [Eastern Site] indicate good quality habitats for benthic organisms," and "[t]he data shows rapid recovery of benthic organisms within the disposal sites after the initial effects of sediment placement." *Id.* at 3262 n.27. The EPA also explained that its "assessment is based on over 40 years of monitoring data on chemistry, toxicity, bioaccumulation, benthic health, and bathymetry to assess physical, chemical and biological changes at the [New London Site] and [Cornfield Shoals Site]." *Id.* at 3262–63. Thus, the record shows that the EPA adequately responded to Southold's objections regarding Sub-Policy 6.1.

Third, Southold argues that the EPA's site designation is inconsistent with Sub-Policy 6.2 of the Southold Program, which aims to protect coastal fish and wildlife habitats. But Southold failed to raise that objection during the notice-and-comment process or in the district court. Southold is therefore precluded from

raising that issue for the first time on appeal. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) ("It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." (citation, internal quotation marks, and alteration omitted)); *Appalachian Power Co.*, 251 F.3d at 1036 ("[A] party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue." (citation, internal quotation marks, and alteration omitted)).

Fourth, Southold argues that the EPA's site designation conflicts with Sub-Policies 8 and 10 of the Southold Program, which contain Southold's waste policy and water-dependent use policy, respectively. Southold failed to raise those two objections during the notice-and-comment process as well and is barred from doing so now. *See Appalachian Power*, 251 F.3d at 1036.

Fifth and finally, Southold argues that the EPA's site designation is inconsistent with Sub-Policy 11 of the Southold Program, which promotes the sustainable use of living marine organisms and the protection of their habitats. But the EPA's response to this objection, too, was adequate:

> EPA directly considered the question of habitat effects and concluded that the site would not have significant adverse effects on marine habitat. . . . Furthermore, . . . EPA re-delineated the boundaries of the [Eastern Site] to exclude two rocky, hardbottom areas that could

41

provide relatively higher quality habitat for marine organisms. . . . Thus, EPA remains confident that designation of the [Eastern Site] is consistent with the Marine Resources Policies to the maximum extent practicable.

Joint App'x 3278. Southold does not explain why this response was inadequate, so its final objection fails as well.

### ii. NEPA

Finally, Southold contends that the Environmental Impact Statement the EPA submitted in support of its Eastern Site designation is inadequate because the agency failed to take a sufficiently "hard look" at its environmental impact in violation of the Supreme Court's decision in *Kleppe*, 427 U.S. 390. Southold Br. 20.

Southold abandoned this claim in the district court. Although Southold's complaint raises a NEPA claim, the town did not mention that claim in its summary judgment briefing. And the district court's decision did not discuss it, either. We therefore conclude that Southold is precluded from belatedly asserting its NEPA claim on appeal. *See In re Nortel Networks*, 539 F.3d at 132.

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the district court.